**In re James R. & Wilda J. GRISHAM, Debtors.**

**Mabank Bank, Plaintiff,**

**v.**

**James R. and Wilda J. Grisham, Defendants.**

**In re James Kelly and Karen Lynn Grisham, Debtors.**

**Mabank Bank, Plaintiff,**

**v.**

**James Kelly & Karen Lynn Grisham, Defendants.**

Bankruptcy Nos. 398–34156–SAF–7, 398–34157–SAF–7.
Adversary Nos. 398–3626, 398–3625.

United States Bankruptcy Court, N.D. Texas, Dallas Division.

Jan. 25, 2000.

Richard G. Dafoe, Vial, Hamilton, Koch & Knox, Dallas, for Plaintiff—Mabank Bank.

Don T. Cates, Forney, Counsel for James R. & Wilda J. Grisham and James Kelly & Karen Lynn Grisham.

## MEMORANDUM OPINION
## AND ORDER

STEVEN A. FELSENTHAL,
Bankruptcy Judge.

Mabank Bank, a division of First State Bank of Athens, holds a judgment against the debtors James R. Grisham and James Kelly Grisham. In these two adversary proceedings, the bank contends that the judgment should not be discharged pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4) or (a)(6). The bank further contends that James and Kelly and their wives, Wilda J. Grisham and Karen Lynn Grisham, should be denied a discharge pursuant to 11 U.S.C. § 727(a)(2), (3), (4) and (5). The court jointly tried these adversary proceedings on December 15, 1999.

This memorandum opinion contains the court's findings of fact and conclusions of law. Bankruptcy Rule 7052. The determination of the discharge of the debtors and the dischargeability of debts constitute core matters over which this court has jurisdiction to enter final judgments. 28 U.S.C. §§ 157(b)(2)(I) and (J) and 1334.

James and Kelly Grisham do business as J & K Cattle Co., a partnership which they equally own. J & K Cattle buys, raises, breeds and sells cattle. On November 10, 1995, the Grishams borrowed $600,000.00 from the bank. They executed a promissory note and pledged their cattle and equipment to the bank as security. During 1996 the bank advanced an additional $120,000.00 to the Grishams for their cattle business.

On December 11, 1996, James and Kelly paid the bank the interest due on the loan and the bank renewed their loan. The Grishams executed a promissory note to the bank for $720,322.00 and pledged their cattle and certain equipment as security. The bank filed and perfected its security interest in the cattle.

Although the Grishams paid the bank the interest due on the loan in 1997, the bank declined to renew the loan. According to Jimmy Clark, a vice present of the

Mabank branch of the First State Bank of Athens, in December 1997, James told Clark that he sold the cattle pledged to the bank as collateral. James denies that he told Clark in December 1997 that he sold the cattle. Rather, James testified that the bank refused to renew the note, with Clark telling him to move the note to another financial institution. James could not obtain refinancing and the bank issued a written demand for payment of the note.

The Grishams did not pay the note. The bank commenced litigation in state court to collect on the note and obtained a judgment against James and Kelly d/b/a J & K Cattle, but not against their wives, for $785,045.50 plus interest, which the bank abstracted on April 6, 1998. The bank then executed on its judgment. The bank applied a $50,000.00 certificate of deposit pledged as collateral. The sheriff seized and sold approximately 350 head of cattle for $109,912.86, although other entities claim an interest in some of the cattle sold. The Grishams filed their bankruptcy petitions on May 7, 1998.

Shortly after the 1995 loan, on January 1, 1996, the parties agree that J & K Cattle held cattle valued at $886,875.00. At the time of the renewal, on December 31, 1996, J & K Cattle held cattle valued at $1,187,637.00. But when the note was due on December 31, 1997, J & K Cattle held cattle worth only $108,500.00. The Grishams paid the interest due on the note but did not reduce the principal.

Under the terms of the loan agreement, the Grishams pledged "[a]ll cattle now owned or hereafter acquired." The Grishams also pledged all equipment then existing or later obtained. The parties stipulate that the security agreement provides that all cattle in the possession of J & K Cattle is collateral for the loan. The Grishams were not to sell the bank's collateral without the bank's written consent. The bank contends that the Grishams disposed of the bank's collateral without its consent and without applying the proceeds to the

debt. The bank maintains that, as a result, the judgment may not be discharged. In addition, the bank asserts that since the Grishams cannot account for the cattle, they must be denied a discharge.

The bank further contends that it obtained a lien on the Grisham's equipment but that it did not realize any value from that equipment.

### Dischargeability

■ Exceptions to discharge should be construed in favor of debtors since the Bankruptcy Code provides a fresh start to debtors unhampered by pre-existing financial burdens. *In re Davis*, 194 F.3d 570, 574 (5th Cir.1999). But the Code does not create a haven for wrongdoers. Rather it provides the "honest but unfortunate debtor who surrenders his property a new opportunity in life unhampered by pre-existing debt." *Id.* The creditor objecting to the discharge of a debt has the burden of establishing the exception by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286–88, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

In its complaint, the bank requests that the court "determine the obligations and indebtedness of the [d]ebtors ... to be nondischargeable." Prior to the filing of the bankruptcy petitions, the bank commenced suit in state court on the note and obtained a judgment against the Grishams. That judgment constitutes the debtors' indebtedness to the bank. The bankruptcy court defers to the state court for the pre-bankruptcy adjudication of the indebtedness. *Davis*, 194 F.3d at 574. The bank apparently did not seek and did not obtain a judgment against the wives.

### Section 523(a)(2)(A)

The bank avers that the Grishams obtained an extension, renewal or refinancing of the loan by false pretenses, false representation or actual fraud.

■ Under § 523(a)(2)(A), the court may not discharge a debt for money obtained by false pretenses, a false representation or actual fraud, other than a statement respecting the debtor's financial condition. Fraud may include fraud in the inducement and actual fraud in the transaction. To except a debt under this section, the bank must establish by a preponderance of the evidence that, either in the inducement or in the actual transaction, the Grishams made false representations, with the intent and purpose of deceiving the bank, and that the bank justifiably relied on the representations, and that it sustained a loss as a result of the representations. *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995); *In the Matter of Allison*, 960 F.2d 481, 484–85 (5th Cir.1992)(reliance must be justified); *In re Smith*, 113 B.R. 297, 304 (Bankr.N.D.Tex.1990).

■ The bank renewed the note in December 1996. The parties stipulate that J & K Cattle held cattle valued at $1,187,-637.00. The bank renewed the loan based on that collateral. The bank knew that the Grishams sold cattle during 1996. But in 1996 the Grishams' herd grew on balance and in value and the Grishams paid the interest due on the loan when the bank renewed the credit. The bank has not established by a preponderance of the evidence that it extended, renewed or refinanced the debt in December 1996 as a result of any false pretense, false representation or fraud by the debtors. This claim shall be dismissed.

### Section 523(a)(4)

The bank alleges that the Grishams sold cattle out of trust without paying the proceeds to the bank. In its complaint, the bank avers that the judgment must therefore be excepted from discharge pursuant to 11 U.S.C. § 523(a)(4).

■ Section 523(a)(4) of the Code excepts from the debtor's discharge any debt "for fraud or defalcation while acting in a fiduciary capacity ..." To show nondischargeability under § 523(a)(4), a creditor must prove by a preponderance of the evidence that (1) the debt was caused by

fraud or defalcation, and (2) there was a fiduciary relationship between the parties at the time the debt was created. *In re Chavez*, 140 B.R. 413, 422 (Bankr.W.D.Tex. 1992).

 A fiduciary under § 523(a)(4) does not refer to any relationship involving confidence, trust, or good faith, rather § 523(a)(4) concerns a relationship arising out of a technical or express trust. *In re Tran*, 151 F.3d 339, 342 (5th Cir.1998); *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934). An express trust traditionally includes: (1) an explicit declaration of a trust, (2) a defined trust *res,* and (3) an intent to create a trust relationship. *In re Chavez*, 140 B.R. 413, 423 (Bankr.W.D.Tex.1992) citing *In re Sax*, 106 B.R. 534 (Bankr. N.D.Ill.1989). A technical trust may be imposed by law. *In re Angelle*, 610 F.2d 1335, 1341 (5th Cir.1980).

 The bank has not provided evidence of an express trust. The bank has not introduced a written trust agreement. The parties' conduct does not establish a trust relationship. Neither the statutes nor the common law of Texas impose a trust relationship on the parties. Rather, the parties had a debtor-creditor relationship only. Accordingly, the bank has not established that the Grishams committed an act of defalcation while acting in a fiduciary capacity. This claim shall be dismissed.

### Section 523(a)(6)

The bank alleges that it suffered an injury when the debtors willfully and maliciously sold the bank's collateral without the bank's consent and without paying the proceeds to the bank.

 Section 523(a)(6) of the Bankruptcy Code provides that a debt for "willful and malicious injury by the debtor to another ..." is not dischargeable. A willful injury requires "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Ka-*

*waauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998). The creditor must establish "either an objective certainty of harm or a subjective motive to cause harm." *In re Miller,* 156 F.3d 598, 603 (5th Cir.1998).

 In addition to willful, the injury must be "malicious." Malicious means "without just cause or excuse." *In re Garner,* 56 F.3d, 677, 681 (5th Cir.1995). The Fifth Circuit has suggested that the Supreme Court in *Kawaauhau* has collapsed the malicious definition into the willful injury definition. *See In re Caton,* 157 F.3d 1026, 1030 (5th Cir.1998). But, as the Circuit itself notes, the Supreme Court addressed only a willful injury. 157 F.3d at 1030 n. 19. The *Garner* definition of malicious injury remains binding on this court. Congress required a "willful and malicious injury." A debtor may act deliberately or intentionally to injure a person but have just cause or excuse to do so. For example, a driver of an automobile deliberately swerves into a car in an adjoining lane to avoid running over a child standing in his lane. The driver intends to cause injury in the adjoining car to save the life of the child. The words "and malicious" cannot be read out of the statute. *See U.S. Dept. of the Treasury v. Fabe,* 508 U.S. 491, 504, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993).

Justice Benjamin Cardozo explained 60 years ago in the context of a challenge to the dischargeability of a debt based on an act of conversion:

> But a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice ... There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what

is done is a tort, but not a willful and malicious one.

*Davis v. Aetna Acceptance Co.,* 293 U.S. at 332, 55 S.Ct. 151.

On December 31, 1996, J & K Cattle held cattle valued at $1,187,637.00. On December 31, 1997, J & K Cattle held cattle valued at $108,500.00. In fiscal year 1996, J & K Cattle reported sales of livestock of $359,759.00, and in fiscal year 1997, it reported sales of livestock of $647,742.00. But in December 1997 the Grishams paid only the interest due on the note and did not make any payments on the principal.

Clark, accompanied by James, conducted an agricultural inspection of the bank's collateral in May 1996. Clark listed 2,993 head of cattle. Clark dated the report May 20, 1996, and James agreed, on May 21, 1996, in writing to that count. Clark testified that despite the severe drought in the region in 1996, the cattle should still have been worth on average $400.00. That produces a value of $1,197,200.00, which is consistent with the stipulated value as of December 31, 1996. James testified, however, that the cattle suffered a dramatic loss in value because of the drought. He suggested an average price of $225.00 to $250.00. That produces a value of $673,425.00 to $748,250.00.

Clark testified that he conducted another agricultural inspection of the bank's collateral in May 1997. Clark listed 3,099 head of cattle. James testified that Clark made up that figure. While James' testimony was confusing at times, he ultimately testified that the May 1997 report, not the earlier reports, was incorrect. Clark further testified that he did an estimation in January 1998 of 500 to 600 head. James would not agree to that figure.

But if James is correct, and Clark over counted the cattle in May 1997 and overestimated the cattle in January 1998, J & K Cattle nevertheless had 2,993 head in May 1996 which James valued at $673,425.00 to $748,250.00 in May 1996 and over $1,000,-

000.00 in December 1996. Whether valued at $225.00 on average per head or $400.00 on average per head, and whether more or less severely impacted by the drought conditions, James and Kelly disposed of a substantial number of head of cattle by December 1997, without the bank's consent and without paying the proceeds to the bank for application to the loan. By December 31, 1997, the cattle had been reduced in value to $108,500.00, and, by the time of the sheriff's sale, the bank realized value on less than 400 head for about $109,912.86.

James acknowledged that he sold cattle during 1997. James testified that he deposited all the proceeds of the sales in the J & K operating account with the bank. But the deposit of the proceeds in the bank account does not constitute payment on the debt. Clark and Ronnie Davis, also of the bank, testified that the bank does not monitor daily transactions in the bank account but rather looks to loan performance and its collateral. But whether the bank monitored deposits or not, the bank did not provide written consent for the sale and use of the collateral.

Because of the drought, the Grishams faced harder than usual times. But they also expanded their businesses by purchasing the Van Zandt livestock barn facility. James testified that he and Kelly used the proceeds from cattle sales to fund operations. But if the Grishams sold collateral without replacing cattle, then the bank should have either consented to the use of the proceeds for operating expenses or the Grishams should have paid the proceeds to the bank.

James testified that he and Kelly also "bought cows in the country." They would purchase cattle, take the cattle to their Van Zandt livestock barn, and sell them, making about a $12.00 fee per head on the transaction. They would deposit the proceeds in the Mabank account. Because of the pace of the transaction and because they made only a fee on the transaction, the Grishams did not consider the cattle to

be the bank's collateral. They disposed of a substantial number of cattle in this fashion. Under a literal reading of the parties' agreement, the cattle acquired in this fashion would be subject to the bank's security interest. But the parties intended the loan to be for cattle purchase, feed and pasture. The bank's witnesses provided no testimony that the parties intended the security agreement to reach these brokered transactions. Because of the short term nature of these transactions, the cattle did not become part of the Grishams' herd and had not been on the debtors' property when the bank annually inspected its collateral. Therefore, regardless of whether these "bought in the country" transactions fell within the security agreement, they do not account for the substantial drop in the value of the Grishams' cattle in 1997 and the corresponding drop in the number of cattle actually in the Grishams' possession from 1996 to 1997 and into 1998.

From this evidence, the bank has established that the Grishams sold the bank's collateral without the bank's written consent and yet the Grishams failed to pay the proceeds of the collateral to the bank and failed to replace the collateral. The Grishams knew that they were selling the cattle, knew that they had not sought or obtained the bank's consent and knew that they did not pay the note with the proceeds.

The bank has, therefore, established that James and Kelly converted the bank's collateral in 1997. The conversion injured the bank, the proceeds not having been used to pay the note. The issue becomes whether James and Kelly deliberately or intentionally injured the bank and, if so, whether they had cause for their actions.

The bank made and renewed the loan to finance J & K Cattle's operations, including purchasing cattle, growing hay for feed and leasing pasture land. In December 1996 the Grishams paid the interest current on the note and the bank renewed the note. The Grishams anticipated the same would be done in December 1997. In 1996 the Grishams sold cattle and used the proceeds for J & K Cattle's operating expenses. In 1997 they did the same. The court infers from the evidence that by December 1996, despite the drought, the Grishams replenished their herd, but by December 1997 they failed to replenish the sold collateral.

James testified that he and Kelly used the proceeds of the sales in 1997 for operating expenses. That was consistent with their course of dealing with the bank. The court infers that in 1996 the bank did not object to the sale of cattle without the bank's express consent to pay operating expenses. The Grishams could reasonably believe the same held for 1997.

The parties agree that drought conditions in 1996 continued into 1997. Although they disagree on the degree, they agree that the drought adversely affected cattle prices and operations in 1997. Consequently, operating expenses should have increased in 1997, with more cattle having to be sold to pay those expenses, yet less cattle would be reproduced.

The Grishams, doing business as J & K Cattle, paid $269,730.00 for interest on their loans and operating expenses in 1997, according to the income tax returns. The Grishams paid the expenses from the proceeds of the sale of cattle. By paying these expenses, the Grishams sought to maintain their business, as they had in the prior year.

Based on their course of dealings and the purpose of the note and its renewal, the bank has not established that James and Kelly deliberately or intentionally injured the bank by using the proceeds of the cattle sales to maintain their business with the intention of renewing the note with the payment of interest.

James and Kelly sold at least $647,-000.00 worth of the bank's collateral in 1997 while using $269,730.00 for interest on the loan and operating expenses. They

have not accounted for the remainder and yet did not use the remainder to replenish the collateral or pay the principal of the note. The bank suggests they used the proceeds to purchase the Van Zandt barn after the bank declined to finance that purchase, but James explained how they financed that transaction. While the court admitted the J & K Cattle bank account record into evidence, neither side established that the bank account reflects how James and Kelly used the rest of the proceeds. Regardless, James and Kelly did not use the proceeds other than the $269,730.00 to service the loan or for operating expenses or to replenish the collateral or to reduce the principal of the loan, and yet they lacked the bank's consent for its use. As to those funds, the only reasonable inference the court can draw from the evidence is that James and Kelly deliberately and intentionally injured the bank without just cause or excuse.

The parties have not presented the court with the state court complaint, but the court presumes the bank obtained a judgment on the note under contract law but not as a tort. The Grishams have not raised a preclusion affirmative defense. But the bank did not obtain a judgment against the wives and the bank has not established that the wives willfully and maliciously injured the bank.

Accordingly, the court finds that of the judgment debt of $785,045.50, James and Kelly willfully and maliciously injured the bank in the amount of $515,315.50, $785,045.50 less $269,730.00. That amount of the judgment shall be excepted from their discharge pursuant to 11 U.S.C. § 523(a)(6). The claim against the wives shall be dismissed.

With regard to all the claims raised by the bank under § 523, the court does not understand the bank to suggest that issues pertaining to equipment constitute grounds for the denial of the discharge of the judgment. The bank tried the adversary proceedings with the equipment issues pertaining to the claims under § 727, addressed below. For purposes of complete findings, the court finds that the bank has not established that the issues pertaining to the debtors' equipment pledged to the bank as security constitutes grounds to deny the discharge of the judgment under § 523(a)(2)(A), (a)(4) or (a)(6).

## Section 727(a)(2)

Not satisfied with its attack on the debtors' conduct under § 523, the bank also seeks to have the court deny the debtors a discharge.

Section 727(a)(2)(A) of the Bankruptcy Code denies a discharge to a debtor who, within one year before his petition is filed, transfers property owned by him with actual intent to hinder, delay, or defraud creditors.

The bank has established that James and Kelly sold cattle subject to the bank's security interest during the second half of 1997, within the one year prior to the filing of the bankruptcy cases. James and Kelly did not pay the proceeds of the sales to the bank and did not have the bank's consent for the sales. James and Kelly deposited the proceeds in the J & K account at the bank but used the proceeds for operating expenses, for loan interest payments, and for unknown uses.

The bank concedes that the drought affected the cattle business in 1996 and 1997. While the parties disagree about the impact on the value of cattle, they agree that the value declined. But the Grishams' operating and living expenses did not decline. James testified that he and Kelly used some of the proceeds for operating expenses. The income tax returns reflect a total of $269,730.00 for operating expenses and loan interest. The court does not infer an intent to hinder, delay or defraud the secured creditor by the use of the proceeds of the sale of collateral to pay operating expenses and loan interest. The debtors tried to stay afloat.

But even accepting the debtors' testimony of the value of the livestock in 1997, they cannot or at least have not accounted for the remainder of the sales proceeds not used for operating expenses or interest payment. Half of that amount occurred within one year of the filing of the bankruptcy petitions. The bank intimates that the Grishams used the proceeds to finance the purchase of the Van Zandt livestock barn when the bank declined to fund that purchase. The debtors explained how they financed that purchase. Although the proceeds of the sale of the cattle had been deposited into the J & K account at the bank, the bank produced no evidence that the Grishams withdrew funds from that account to finance the purchase of the Van Zandt barn.

The debtors' transfer of some of the bank's collateral willfully and maliciously injured the bank. As a result, part of the bank's judgment is excepted from discharge. The collateral was the debtors' property. Without any explanation of the use of the remaining proceeds, the debtors' transfer necessarily hindered the bank within one year of the petitions. As the debtors did not use a portion of the proceeds of the transfers for operating expenses or to replenish the collateral and yet did not seek bank approval for the use and cannot establish the use, the debtors must have intended to hinder the bank. The bank has therefore established by a preponderance of the evidence that James and Kelly transferred the collateral without paying the proceeds to the bank on the loan within one year of bankruptcy with the intent to hinder, delay or defraud the bank.

The bank has, however, produced no evidence that Wilda and Karen had been involved in the transfer.

James and Kelly must be denied a discharge, but as to Wilda and Karen, this claim shall be dismissed.

## Section 727(a)(3)

The bank contends that the debtors concealed, destroyed, mutilated, falsified or failed to keep or preserve recorded information about their financial condition or business transactions.

Section 727(a)(3) is intended to allow creditors and/or the trustee to examine the debtor's financial condition and determine what has passed through a debtor's hands. *In re Esposito*, 44 B.R. 817 (Bankr.S.D.N.Y.1984). The creditors are entitled to written evidence of the debtor's financial situation and past transactions. Maintenance of records is a prerequisite to granting a discharge in bankruptcy. *Broad Nat'l Bank v. Kadison*, 26 B.R. 1015 (D.N.J.1983). Unless the debtor justifies his failure to keep records, a discharge should not be granted. *In re McNamara*, 89 B.R. 648, 653 (Bankr. N.D.Ohio 1988).

The debtors have produced their tax returns which they concede contain accurate information. The Grishams did not, at any time during their business, maintain records of the cattle they owned. They did, however, obtain receipts for the sale of cattle. James testified that he provided those receipts to either his attorney or to the FBI, but not to the bank.

James and Kelly did not stop keeping records of cattle purchased and owned during the events leading to the bankruptcy petitions. Rather, they never kept them. The loan documents required records, but the bank never requested records before or after making the initial loan or the renewal of the loan. The parties did not provide evidence concerning why the debtors produced the sales receipts to the FBI, but since the tax returns accurately reflect income and assets, the creditors of the bankruptcy estate can ascertain the debtors' financial condition and business transactions.

The bank has not established by a preponderance of the evidence that the debt-

ors should be denied a discharge under this section. The claim shall be dismissed.

### Section 727(a)(4)

The bank contends that the debtors have made a false oath by failing to list equipment and the cattle transfers within one year of the bankruptcy petition.

■ To deny the Grishams' discharges under § 727(a)(4), the bank must show that they knowingly and fraudulently made a false oath with respect to a material fact. See 4 Collier on Bankruptcy ¶ 727.04[1], at 727–54 to –57 (L. King 15th ed.1987); *Williamson v. Fireman's Fund Insurance Co.*, 828 F.2d 249, 251 (4th Cir.1987).

■ The bank took a cavalier approach to the equipment securing the loan. The bank took an assignment of a security interest in 1995 covering five John Deere tractors without ascertaining the equipment the debtors owned. James testified about equipment secured by liens superior to the bank. He accounted for each tractor. The bank produced no evidence to counter that testimony. Kelly testified about other equipment in their possession but belonging to other people. The sheriff apparently accepted that explanation at the time of execution on the judgment.

The debtors did not disclose the transfer of the cattle. The debtors testified that they believed that they transferred the cattle in the ordinary course. The Statement of Financial Affairs inquires about transfers "other than in the ordinary course of business." Therefore, the debtors could reasonably conclude that the transfer of the cattle did not need to be scheduled. James testified that all proceeds had been deposited at the J & K account with the bank and used for operating expenses. Although he established that only $269,730.00 had been used for interest on the loan and operating expenses, with this belief, the failure to schedule the transfers cannot be deemed fraudulent, even if the sale of cattle without applying the proceeds to the debt results in the nondischargeability of part of

the bank's judgment. This claim shall be dismissed.

### Section 727(a)(5)

■ The bank finally contends that the debtors should be denied a discharge because they failed to satisfactorily explain the loss or deficiency in the bank's collateral. James and Kelly both testified about their equipment. The bank has no record of any security interest in any equipment not accounted for and addressed by the debtors. The debtors explained where they deposited the proceeds of the sale of the cattle and how they used $269,730.00 of those proceeds. While the parties disagree on the scope and degree, they agree that during the subject time period, the cattle business suffered from drought conditions resulting in some loss of value. But, because the debtors cannot or will not explain the use of the proceeds of the remainder of the collateral, James and Kelly may not obtain a discharge. As to Wilda and Karen, this claim shall be dismissed.

### Food Security Act of 1995

In their joint pretrial order the parties agreed that these adversary proceedings presented a contested issue of law concerning whether § 1324 of the Food Security Act of 1995 required written consent before the sale of the bank's collateral. That issue was not addressed by either party at trial and is accordingly abandoned.

### Conclusion

Failing to communicate cost James and Kelly a discharge. Had they just cause or no ill intent for the sale and use of the bank's collateral, they should have explained their circumstances to the bank and sought the bank's consent. Had a prudent banker not responded in a commercially responsible manner, the plight of the Grishams in their bankruptcy cases might have been different. But, on this record, the bank has established grounds to deny a discharge for James and Kelly

and, even had discharges been entered, exclude part of the judgment from the discharge.

### Orders

Based on the foregoing,

**IT IS ORDERED** that the claims for relief under 11 U.S.C. §§ 523(a)(2)(A) and (a)(4) and §§ 727(a)(3) and (4) are **DISMISSED** as to all the debtors.

**IT IS FURTHER ORDERED** that the claims for relief under 11 U.S.C. § 523(a)(6) and § 727(a)(2) and (5) are **DISMISSED** as to Wilda J. Grisham and Karen Lynn Grisham.

**IT IS FURTHER ORDERED** that $515,315.50 of the judgment held by Mabank Bank against James R. Grisham and James Kelly Grisham and abstracted on April 6, 1998, shall not be discharged pursuant to 11 U.S.C. § 523(a)(6).

**IT IS FURTHER ORDERED** that James R. Grisham and James Kelly Grisham shall not obtain a discharge pursuant to 11 U.S.C. § 727(a)(2) and (5).

Counsel for the bank shall prepare a final judgment for each adversary proceeding consistent with this order.