**In re Joshua Wayne HOLT, Debtor.**

**Lisa Ridley, Chris Ridley and Brenda Ridley, as Guardians and Next of Friend of Lisa Ridley, Plaintiffs,**

v.

**Joshua Wayne Holt, Defendant.**

**Bankruptcy No. 03–31806–SAF–7. Adversary No. 03–3472.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

May 11, 2004.

cation was account debtor's last ditch effort    to avoid liability).

Rosemary J. Zyne, Dallas, TX, for Plaintiffs.

Robert S. Blatt, Fort Smith, AR, for Defendant.

## MEMORANDUM OPINION AND ORDER

STEVEN A. FELSENTHAL, Chief Judge.

Lisa Ridley and Chris and Brenda Ridley as guardians and next of friend of Lisa Ridley, the plaintiffs, assert that debt for injuries caused by Joshua Wayne Holt, the defendant, should not be discharged pursuant to 11 U.S.C. § 523(a)(6). The Ridleys allege that Holt sexually assaulted Lisa giving rise to damages for intentional assault and battery upon Lisa, for false imprisonment and for the tort of outrage, all under Arkansas law. Holt responds that Lisa consented to the sexual act.

The court conducted a trial of the adversary proceeding on February 20, 2004. Pursuant to an order entered on March 2, 2004, the parties filed post-trial briefs, with the Ridleys' reply brief filed on April 6, 2004. This memorandum opinion contains the court's findings of fact and conclusions of law. Bankruptcy Rule 7052. The determination of the discharge of a debt constitutes a core matter over which this court has jurisdiction to enter a final judgment. 28 U.S.C. §§ 157(b)(2)(I) and 1334.

Section 523(a)(6) of the Bankruptcy Code excepts from an individual debtor's discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity[.]" 11 U.S.C. § 523(a)(6). A "willful" injury requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (emphasis in original). To establish an intentional injury, the creditor must establish "either an objective substantial certainty of harm or a subjective motive to cause harm." *In re Miller*, 156 F.3d 598, 606 (5th Cir.1998), cert. denied, 526 U.S. 1016, 119 S.Ct. 1249, 1250, 143 L.Ed.2d 347 (1999). In addition to being willful, the injury must be "malicious." 11 U.S.C. § 523(a)(6). Malicious means "without just cause or excuse." *In re Garner*, 56 F.3d 677, 681 (5th Cir.1995). The Supreme Court in *Kawaauhau* did not collapse the malicious injury definition into the willful injury definition nor otherwise read the words "and malicious" out of the statute. *In re Grisham*, 245 B.R. 65, 71 (Bankr.N.D.Tex.2000). Thus, to be nondischargeable, the debtor had to act to intentionally injure a person without just cause or excuse to do so. *Id.*

The Ridleys have not previously obtained a judgment against Holt in Arkansas. Consequently, the court must first determine whether Holt has a "debt" owing to the Ridleys under Arkansas law. If so, the court must then determine whether the debt is for "willful and malicious" injury to the Ridleys.

Under the Bankruptcy Code, a debt constitutes liability of the debtor, Holt, on a claim. 11 U.S.C. § 101(12). A claim means a right to payment. 11 U.S.C. § 101(5)(A). The court determines the

right to payment under non-bankruptcy law, here, Arkansas law. Each of the claims requires proof of damages.

■ The Ridleys claim that Holt is liable for the intentional assault and battery of Lisa. Under Arkansas law, to establish liability for intentional assault, the Ridleys must establish that Holt acted to create a risk of apprehension of immediate harm or offensive contact on Lisa; that Holt intended to cause that harm or contact; and that Lisa was actually put in that apprehension. *See Arkansas Model Jury Instructions,* Civil AMI 417 (2004 ed.); Restatement (Second) of Torts § 21 (1965).

■ For the intentional battery of Lisa, the Ridleys must establish that Holt acted with intent to cause some harmful or offensive contact with Lisa, or acted with the intent to create the apprehension of some harmful or offensive contact with Lisa; and that harmful or offensive contact with Lisa directly or indirectly resulted. *See Arkansas Model Jury Instructions,* Civil AMI 418 (2004 ed.); Restatement (Second) of Torts § 13 (1965).

■ The Ridleys assert a claim for false imprisonment. Under Arkansas law, the Ridleys must establish that Holt intended to confine Lisa within boundaries fixed by Holt; that Holt's acts directly or indirectly resulted in such a confinement of Lisa; and that Lisa was conscious of the confinement or was harmed by it. *Headrick v. Wal–Mart Stores, Inc.,* 293 Ark. 433, 738 S.W.2d 418, 420 (1987), citing Restatement (Second) of Torts § 35 (1965).

■ The Ridleys also claim that Holt is liable for the tort of outrage against Lisa. Under Arkansas law, the Ridleys must establish that Holt willfully and wantonly engaged in extreme and outrageous conduct, causing damage to Lisa in the nature of emotional distress. "A person acts willfully and wantonly when he knows or should know in the light of surrounding circumstances that his conduct will naturally and probably result in emotional distress and continues such conduct in reckless disregard of the consequences." *Travelers Ins. Co. v. Smith,* 338 Ark. 81, 991 S.W.2d 591, 595 (1999) (quoting from Arkansas Model Instructions). Extreme and outrageous conduct is "conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id.* Physical harm need not be established for recovery. *Angle v. Alexander,* 328 Ark. 714, 945 S.W.2d 933, 937 (1997). Proving the elements of the crime of rape establishes the tort of outrage. *See Berry v. Oswalt,* 143 F.3d 1127 (8th Cir.1998).

### Evidentiary Issues

Holt contends that his juvenile record is confidential and may not be considered as evidence in this trial. On the night of December 21, 2001, the Polk County, Arkansas, sheriff's office arrested Holt. A deputy sheriff informed Holt of his rights regarding police interrogation. Holt gave the sheriff's office written statements, confessing to criminal conduct. On December 23, 2001, the Polk County, Arkansas, prosecuting attorney filed in the Circuit Court for Polk County an application for determination of reasonable and probable cause for a warrantless arrest of Holt, for the crime of rape, a class Y felony in Arkansas. The court granted the application. On December 26, 2001, the prosecuting attorney issued a criminal information charging Holt with rape, a class Y felony.

On February 25, 2002, the prosecuting attorney filed a petition for adjudication of delinquency for Holt. By doing so, the State of Arkansas requested that Holt's case be referred to Arkansas' juvenile jus-

tice system. By order entered March 5, 2002, the Circuit Court for Polk County transferred Holt's case to juvenile court. Holt's case thereafter proceeded in juvenile court to the entry of a juvenile adjudication on July 18, 2002.

Thus, from December 21, 2001, to March 5, 2002, Holt had been the subject of criminal proceedings in circuit court. Circuit court proceedings are not confidential. *See* Ark.Code Ann. § 25–19–105(a)(1)(A) (2003) (with some exceptions, "all public records shall be open to inspection and copying...."); Ark.Code Ann. § 9–27–352(a)(2) (2003) (juvenile records shall be confidential unless "the arrest or the proceedings under this subchapter result in the juvenile's being formally charged in the criminal division of circuit court for a felony."). The proceedings in juvenile court from March 5, 2002, through July 18, 2002, are confidential and will not be considered by this court. Ark.Code Ann. § 9–27–352(a) (2003) (with certain exceptions, records of "the proceedings under this subchapter shall be confidential and shall not be subject to disclosure under the Freedom of Information Act of 1967, § 25–19–101 et seq.").

The Ridleys contend that the court should not consider the deposition testimony of Daniel Pate, Kimberley Backstrom and John Pate. Holt's counsel took these depositions without the Ridleys' counsel being present. Holt's counsel asserts that he provided notice of the depositions. The court's records reflect electronic notice of the depositions to the Ridleys' counsel.

When the Ridleys' counsel did not appear at the deposition, Holt's counsel proceeded to take the depositions, without calling or otherwise attempting to determine why the Ridleys' counsel did not attend the depositions. Counsel's lack of professional courtesy surprises the court. *See Dondi Props. Corp. v. Commerce Sav.*

*& Loan Ass'n*, 121 F.R.D. 284 (N.D.Tex. 1988) (en banc).

Following the depositions, on December 30, 2003, Holt's counsel sent the transcripts of the depositions to the Ridleys' counsel, suggesting that the Ridleys may want to drop the adversary proceeding after reading the transcripts. Holt had originally listed the Pates and Backstrom as witnesses for trial. Holt did not inform the Ridleys' counsel that he intended to use them as witnesses by deposition until two days before trial docket call. The court's scheduling order required that disclosure be made three days before the trial docket call.

Ridleys' counsel contends under the circumstances that the depositions should not be considered.

■ As with proof of mailing of a notice by first class mail, proof of electronic notice presumes receipt of the notice. The Ridleys' counsel must present evidence to rebut that presumption. While the court does not question counsel's representation that she personally did not receive the notice, counsel did not present evidence about how her office processes electronic notice to support a finding that the office did not receive the notice. Without that evidence, the presumption of receipt has not been rebutted. The court therefore admits the transcripts of the depositions into evidence.

### The Incident

Following a high school basketball game on December 21, 2001, Lisa Ridley testified that she went to a party with her friend, Hannah Burkett. Lisa was fourteen years old, turning fifteen the next day. The party was at the home of a high school age boy. There was no adult supervision at the house. Alcohol was being consumed. Lisa testified that she drank a

bottle of Hooch, a citrus fruit drink with alcohol.

Joshua approached Lisa at the party. Joshua had been dating Hannah, and Lisa knew of Joshua from Hannah. Lisa testified that Joshua made advances to her. She testified that Joshua asked Lisa if Hannah would sleep with him. Then Joshua asked Lisa if Lisa would sleep with him. Lisa said she would not. As Joshua pressed, Lisa informed Joshua that she was menstruating. According to Lisa, Joshua said he did not care. So Lisa told him that Hannah would get angry. As the exchange continued, Lisa crossed the room to talk to Hannah.

Lisa testified that she had to use the bathroom. The bathroom was adjacent to the master bedroom, accessible through the bedroom. Lisa testified that, after she had gone in the bathroom and closed the door, Joshua entered the bathroom. Lisa testified that Joshua locked the bathroom door, grabbed her from behind, tried to pull down her pants, wrestled her to the floor, and started raping her. She asked him to stop, but she did not scream.

Lisa testified that she noticed shadows through the sides of the door. Joshua realized people were outside the door. He stopped. He put on his pants and left the bathroom. Humiliated, Lisa grabbed her coat and left the house with Hannah.

Lisa testified that, before leaving the driveway, she and Hannah argued, and Hannah got out of the car. A friend drove Lisa home. Lisa testified that she saw her mother at home but did not tell her what had happened. Lisa did not tell her mother that she was going to the party after the game. Hannah later arrived at Lisa's house to wait for her mother to pick her up. Lisa testified that while waiting, she told Hannah about the assault. Hannah's mother arrived to pick up Hannah. Lisa testified that Hannah told her mother about the assault. Lisa and Brenda Ridley testified that Hannah's mother informed Brenda Ridley of the assault. Lisa's parents called the police and took Lisa to the hospital for an evaluation.

Joshua presented a different version of the event. Joshua conceded that he had intercourse with Lisa. Joshua was seventeen at the time. Joshua testified that he talked to Lisa about "messing around" with his friend John Pate. Joshua acknowledged that he talked to Lisa about sex. Joshua asked Lisa if she previously had intercourse. Lisa did not comment. Joshua asked Lisa about personal matters. Joshua testified that a friend of his asked Lisa if it mattered that Joshua was Hannah's former boyfriend. Joshua went outside to obtain a condom from one of the boys at the party.

Joshua testified that he told Lisa that he had a condom. Joshua testified that Lisa said that was fine with her. He testified that he said "let's go" and that Lisa said that she wanted to go to an area where people were not around. Joshua testified that he then led Lisa down the hall, to the bedroom, holding her hand. They went through the bedroom. At the bathroom, Joshua testified that he opened the door, Lisa went in and he followed her.

Joshua testified that they both took off their own clothes. Lisa lowered her pants, slipping a leg and foot out of one leg of the pants. They started kissing. According to Joshua, they laid down on the floor and had intercourse.

Joshua testified that he did not lock the bathroom door. Several of the boys at the party came to the door, cracked it open and watched Lisa and Joshua. Embarrassed, both Joshua and Lisa dressed and left.

Joshua testified that alcohol was present at the party but that he did not drink until

later in the night. He testified that he encouraged Lisa to have intercourse with him but did not force her. He conceded that Lisa told him she was menstruating but testified that he said he did not care.

Following his arrest later in the night, Joshua gave the police several written statements. He testified that by the time of his arrest, he was intoxicated. As a result, he could not be certain that he accurately described the events in his written statements. Consequently, he testified that he might have given the police a false statement.

In one of his statements, Joshua wrote that he started drinking around 9:00 p.m. and "was pretty messed up." He wrote that he talked to Lisa about having sex. Lisa told him she was menstruating. He wrote that they went to the bathroom. He turned off the lights. He locked the door. She removed her tampon. He wrote that he said "let's get on the floor." He wrote: "She did not want to do anything." He wrote that he continued to pursue her; and she relented. He wrote that he did not physically force himself on her, but "[I] admit I raped her. I was drunk and I messed up." In another written statement, he wrote that he did force himself on her and that he "did force her to have sex with me." While in one statement Joshua wrote that he locked the bathroom door, in another statement he wrote that a boy opened the door and started laughing.

John Pate, Joshua's friend, testified that Lisa asked him to "mess around" at the party. Later, John saw Lisa and Joshua walking together down the hallway towards the bedroom, but not holding hands. That is all he saw. Despite alcohol being present at the party, John testified that he did not drink.

Daniel Pate, John's brother and another friend of Joshua's and a former football teammate of Joshua's, testified that he followed Joshua and Lisa to the bathroom. He testified that Lisa entered the bathroom first. Joshua followed, closing but not locking the door. Daniel testified that a boy cracked open the door so a group could watch. Daniel said they watched Lisa and Joshua undress, get on the floor and have intercourse. However, Daniel testified that he left the area while Lisa and Joshua were still on the floor. Daniel also testified that he was not drinking alcohol at the party.

Kimberly Backstrom testified that she overheard a conversation at the party between Lisa and Hannah, when Lisa asked Hannah if Hannah minded if Lisa had sex with Joshua. Although alcohol was present at the party, she too testified that she did not drink. Kimberly testified that she was sitting next to Hannah and overheard the conversation between Lisa and Hannah. Kimberly also testified that she heard Lisa tell Hannah that she was menstruating. Later she saw Lisa and Joshua walk to the back bedroom. Kimberly attended classes with Joshua. Sometimes they attended the same church. Kimberly knew Joshua played football for the high school. Lisa attended a different high school.

Lisa's testimony is more credible than Joshua's testimony. The court accords greater weight to Lisa's testimony. The testimony of the John, Daniel and Kimberly is not credible.

Only Lisa acknowledged at trial that she had consumed alcohol at the party before the incident. The court does not find it credible that at an un-chaperoned high school party after a basketball game on a Friday night with alcohol present that none of the witnesses who testified on Joshua's behalf consumed alcohol at the party. Joshua testified that he did not drink alcohol until after the incident, al-

though he told the police in his written statement that he was intoxicated when he assaulted Lisa. Daniel Pate testified that Joshua was intoxicated.

Lisa may have been flirting with Joshua and flitting back and forth between Joshua and Hannah. But the court does not find Joshua's testimony that Lisa consented to having intercourse with Joshua when she was menstruating to be credible. The embarrassment for a fourteen-year-old turning fifteen would have been overbearing.

Kimberly's testimony that she overheard Lisa ask Hannah if she could have sex with Joshua is also not credible. Kimberly did not know Hannah's last name. Kimberly had not seen Hannah "in forever." Joshua was Kimberly's classmate. Joshua played football for Kimberly's high school while Lisa attended a different school. Kimberly gave her deposition on December 19, 2003, two years after the incident. The court does not find credible Kimberly's testimony that she just happened to be sitting next to Hannah at this high school party, not drinking, but overhearing a conversation where one girl was asking another girl if she could have sex with her former boyfriend. Kimberly testified that Hannah at first said it would not be a good idea, but then said it was "like okay." The court does not find it credible that Hannah would have told Lisa it was "like okay" for Lisa to have sex with Joshua. Lisa's testimony that she never asked Hannah if she minded if Lisa had sex with Joshua is more credible.

John Pate said that Lisa and Joshua were not holding hands when they went toward the bedroom. Joshua claimed they were holding hands. John never saw them reach the bedroom. Daniel Pate, Joshua's friend and a fellow athlete at Joshua's high school, said he watched Lisa and Joshua when another boy opened the bathroom door. Daniel testified that he left the bed-

room while Lisa and Joshua were still "having sex." But Daniel testified that other people went to the bathroom, and "I guess they had busted in the door or they had opened the door . . . and scared them . . . and they both jumped up and started putting clothes on and they both came out." Daniel could not know that because he testified that he had already left the bedroom. He had no basis to "guess." The court finds it more likely that he did not see anything and merely "guessed" at the whole incident to help his friend.

Joshua's trial testimony is the most incredible. His testimony conflicted with several statements he gave the police. The court assumes that Joshua was scared when he met with the police, and intoxicated. Nevertheless, his statements to the police strike the court as entitled to greater weight than his trial testimony. The court does not find Joshua's trial testimony that he had not consumed alcohol before the incident credible. Not even his friend Daniel corroborated that testimony. Joshua's trial testimony that he did not lock the bathroom door is not credible. If Joshua and Lisa engaged in consensual intercourse, Joshua would have locked the bathroom door to ensure privacy. And, if Joshua assaulted Lisa, forcing himself on her, he surely would have locked the bathroom door. His statement to the police that he locked the bathroom door is more credible than is his trial testimony.

As found above, Joshua's trial testimony that Lisa consented to intercourse while she was menstruating is not credible. Joshua told the police that he raped Lisa and that he had messed up. He testified at trial that he made that statement because he learned of Lisa's age. The court does not find it credible that a seventeen-year-old boy would confess to rape merely because he learns the night of the incident

that the girl is fourteen, turning fifteen at midnight that night.

Lisa's testimony is not without its problems. Lisa's parents consented to the disposition of Joshua's juvenile case. They did not pursue a civil action for damages until they learned that Joshua's mother was the beneficiary of a trust of which Joshua would become beneficiary upon her death.

Hannah did not testify.

Nevertheless, Lisa's testimony is entitled to the greater weight, her testimony being more credible than Joshua's and his witnesses.

Lisa received medical attention at the Mena, Arkansas, Medical Center's emergency room the night of December 21, 2001. She was examined and provided with a sexual assault kit, but was not otherwise treated.

Lisa suffered from anxiety and fear. She reported to her family physician that she suffered through hours of crying spells, had difficulty interacting with her father, and had trouble sleeping. Lisa's parents testified that she has been fearful and depressed since the incident. Lisa's mother testified that Lisa has consulted with their family physician about six times over the past two years. He had prescribed Paxil for depression, which he renewed over the next several months. Lisa also attended about ten sessions with a psychotherapist. Lisa's father testified that Lisa has been very emotional since the incident, with continuous crying spells. Lisa testified that she feels friendless, alone and depressed.

The parties agreed that damages would be determined at a subsequent proceeding if this court held the debt not dischargeable. Lisa has established that she has been damaged. Lisa will be able to estab-lish at a subsequent trial the amount of damages.

### The Claims

The court finds that the Ridleys have established by a preponderance of the evidence that Joshua engaged in sexual intercourse with Lisa, while she was fourteen years old, turning fifteen the following day, by forcible compulsion. Lisa did not consent to the sexual intercourse.

■ By doing so, Joshua intended to harm Lisa. Joshua also intended to have offensive contact with Lisa. An intent to harm necessarily includes an intent to injure. An intent to have the offensive contact of a sexual assault necessarily includes an objective substantial certainty of causing harm. *See Pettey v. Belanger*, 232 B.R. 543, 547 (D.Mass.1999) ("[w]here intentional torts involving the person are concerned, the act of committing the tort in itself is an injury to the victim[,]" and "proof the [debtor] committed sexual assault and battery in itself provides proof that he intended to injure [the victims]"). Lisa perceived and comprehended that Joshua intended to harm her and to have offensive contact with her—what Arkansas law refers to as the apprehension by the plaintiff of imminent contact. Lisa was injured by the assault. Harmful contact directly resulted from the assault. Joshua had no just cause or excuse for sexually assaulting Lisa. Accordingly, the court finds that the Ridleys have established by a preponderance of the evidence that Joshua committed the intentional torts of assault and battery. In doing so, Joshua willfully and maliciously injured Lisa. The Ridleys therefore have established a debt, and the debt is not discharged.

■ Joshua detained Lisa in the bathroom without her consent and without legal authority. He did so by threat of force. The Ridleys established by a pre-

ponderance of the evidence that he detained her by sexually assaulting her. Joshua acted directly to cause Lisa's confinement. Lisa knew she was being confined. Joshua's greater size and strength heightened her consciousness of the confinement. Lisa was harmed by the detention. Joshua acted deliberately and intentionally. By doing so, he intended to cause harm, either physical or emotional or both. The court further holds that a deliberate and intentional act to detain a teenage girl to forcibly have sexual intercourse with her has the objective substantial certainty of causing harm. Joshua had no just cause or excuse for detaining Lisa without her consent. Accordingly, the court finds that the Ridleys have established by a preponderance of the evidence that Joshua falsely imprisoned Lisa. In doing so, Joshua willfully and maliciously injured Lisa. The Ridleys therefore have established a debt, and the debt is not discharged.

■■■ By engaging in sexual intercourse with Lisa by forcible compulsion, Joshua willfully and wantonly engaged in extreme and outrageous conduct, as defined by Arkansas law. Joshua knew that his acts naturally and probably would result in Lisa's emotional distress, yet Joshua continued in his reckless conduct in disregard of the consequences. His conduct was outrageous in character and extreme beyond the bounds of a civilized society. Indeed, the conduct is a crime in Arkansas. Lisa suffered emotional harm as a result of the conduct. Contrary to Joshua's argument, the definition of willful and wanton conduct in Arkansas subsumes the definition of willful and malicious injury under § 523(a)(6). Emotional distress is an injury. When a person acts knowing that the act will naturally and probably result in emotional distress and yet continues to engage in the act in reckless disregard of the consequences, the person acts with an objective substantial certainty to cause harm or a subjective motive to cause harm. Joshua had no just cause or excuse for the conduct. Accordingly, the court finds that the Ridleys have established by a preponderance of the evidence that Joshua committed the tort of outrage. In doing so, Joshua willfully and maliciously injured Lisa. The Ridleys therefore have established a debt, and the debt is not discharged.

The court acknowledges that Lisa Ridley's parents are named plaintiffs. However, the court does not read the non-dischargeability claim as one on the parents' behalf. Rather, the court recognizes that the parents appear on behalf of Lisa as a minor. It has not been established that the parents themselves have any claims against Joshua. *See Rosa v. Jones (In re Jones),* 144 B.R. 242, 243 (Bankr. N.D.N.Y.1992) (parents of a minor daughter victimized by rape are not entitled to an order excepting from discharge a claim for any compensatory or punitive damages allegedly suffered by the parents in a derivative action based upon a willful and malicious injury pursuant to § 523(a)(6) of the Code).

### Order

Based on the foregoing,

**IT IS ORDERED** that Lisa Ridley, Chris Ridley and Brenda Ridley, as guardians and next of friend of Lisa Ridley, shall have a judgment declaring that the debt of Joshua Wayne Holt for intentional assault and battery, false imprisonment and/or the tort of outrage shall not be discharged, pursuant to 11 U.S.C. § 523(a)(6). The amount of the debt shall be determined by a court of competent jurisdiction in a subsequent proceeding.

Counsel for the Ridleys shall submit a proposed final judgment consistent with this order.